UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Patrick J. Griffin, III, an individual,<br>14101 Berryville Road<br>Darnestown, Maryland 20874-3517<br><br>Sons of Confederate Veterans, a Mississippi non-<br>profit corporation, R.G. Wilson, Commander-in-<br>Chief,<br>740 Mooresville Pike, Columbia, TN 38401.<br><br><br>Point Lookout Prisoner of War Assn.,<br>A nonprofit unincorporated association,<br>Patricia B. Buck, President,<br>1214 Moyer Road, Newport News, VA 23608-2453<br><br>  Plaintiffs,<br><br>  vs.<br><br>Department of Veterans Affairs, a Department of<br>the United States Government;<br>810 Vermont Avenue, NW<br>Washington, D.C. 20420-0001<br><br>Roger R. Rapp, Director, National Cemetery<br>System, a Division of the Department of Veterans<br>Affairs, an individual, in his official capacity,<br>810 Vermont Avenue, NW<br>Washington, D.C. 20420-0001<br><br>Ken Stoner, Director, Point Lookout Confederate<br>Cemetery, an individual, in his official capacity,<br>5501 Frederick Avenue<br>Baltimore, Maryland 21228,<br><br>  Defendants | Civil Action No. WMN-02-1917<br><br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF<br>PLAINTIFFS' MOTION FOR<br>PRELIMINARY INJUNCTION |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   A.  The Cemetery and the Annual Confederate Memorial Ceremony . . . . . . . . . . . . 4

   B.  The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   C.  The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   D.  The Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      1.  The Dispute over Formal Speeches at the Confederate
          Memorial Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         a.  The VA's Prohibition of Mr. Griffin's June 8, 2002 Speech . . . . 7

         b.  The June 7, 2002 TRO Hearing and the Modification of
             Mr. Griffin's and Mrs. Buck's Speeches . . . . . . . . . . . . . . . . . 9

         c.  Fr. Anderson's Speech and the VA's Censorship Scheme  . . . . . 9

         d.   Mr. Griffin's Proposed June 14, 2003 Speech  . . . . . . . . . . . . 15

      2.  The Dispute over Informal Speech at the Cemetery on
          Other Occasions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      3.  No Improper Conduct has Occurred in Connection with the Confederate
          Memorial Service or Other Visits by Plaintiffs to the Cemetery . . . . . . 17

   E.  The VA's Written Speech Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

## TABLE OF CONTENTS (Cont'd.)

F.     Those Who Violate the Speech Restrictions of § 1.218(a)(14) Face

Possible Fine and Imprisonment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    THE FIRST AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.    THE STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF . . . . . . . . . . . . . . 19

V.     THE VA's SPEECH RESTRICTIONS AND CENSORSHIP REQUIREMENT

VIOLATE THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.    The VA's Speech Restrictions must be Viewpoint-Neutral and Reasonable. . . 19

B.    Defendants Bear the Burden of Demonstrating that the VA's Speech

Restrictions Meet Constitutional Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    The "Partisan Activities" Prohibition Violates the Viewpoint-Neutral

Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.     The Prohibition Selectively Prohibits Disfavored Viewpoints . . . . . . . 22

2.     The Supreme Court has Rejected the VA's Argument that

the Prohibition is Viewpoint-Neutral . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.     The VA's Purported Concern with "Decorum" and "Tranquility" is a

Transparent Facade for Viewpoint Discrimination . . . . . . . . . . . . . . . 26

a.     The Underinclusiveness of "Partisan Activities" Belies any

Genuine Concern with "Decorum" or "Tranquility." . . . . . . . . 26

b.     The VA has Opened the Confederate Memorial Service to

Speech it Views as Far More Inflammatory than the

Verbal Speech in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ii

## TABLE OF CONTENTS (Cont'd.)

D. Application of the "Partisan Activities" Prohibition to Plaintiffs is Unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

 1. Exclusion of Mr. Griffin's and Fr. Anderson's Remarks is not Necessary to Preserve the Forum for its "Intended Use" as a Forum for what the VA Considers an Extreme Form of Provocative and Controversial Speech . . . . . . . . . . . . . . . . . . . . . . . . 29

 2. There is No Evidence that the Forms of Speech the VA Forbids Lead to "Disruption" of, or Improper Conduct in, the Cemetery. . . . . . 30

 3. The VA Erroneously Views the Expression of Disfavored Viewpoints as "Disruption" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

E. The Prohibition on Speech "Attempting to Influence" Unreasonably Subjects Speakers to the Inferences Officials May Draw as to their "Intent." . . . . . . . . 34

F. The "Orations" Prohibition is an Unreasonable Prior Restraint on All Speech Among "Groups" of People at the Cemetery. . . . . . . . . . . . . . . . . . . . . . . . . . 36

VI. THE VA's UNWRITTEN RESTRICTIONS VIOLATE 39 U.S.C. § 901 AND THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

VII. THE VA'S CENSORSHIP POLICY VIOLATES 39 U.S.C. § 901 AND THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VIII. THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS FAVOR ISSUANCE OF THE INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IX. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## **TABLE OF AUTHORITIES**

Cases                                                                                                                  Page(s)

*Arkansas Educ. Television Comm. v. Forbes*
523 U.S. 666 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*City of Lakewood v. Plain Dealer Pub. Co.*
486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Cohen v. California*
403 U.S. 15 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 32, 33, 34

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*
473 U.S. 788 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 26, 27

*Elrod v. Burns*
427 U.S. 347 (1976)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Florida Star v. B.J. F.*
491 U.S. 524 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Griffin v. Dept. of Veterans Affairs*
129 F. Supp. 2d 832 (D. Md.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 19 28, 29

*Griffin v. Secretary of Veterans Affairs*
288 F.3d 1309 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 19, 28, 29, 38

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*
174 F.3d 411 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*International Society for Krishna Consciousness, Inc. v. Lee*
505 U.S. 672 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21, 29

*Board of Airport Commissioners v. Jews for Jesus, Inc.*
482 U.S. 569, 102 S. Ct. 2568 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31, 36, 40

*Lamb's Chapel v. Center Moriches Union Free School Dist*
508 U.S. 384 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES (Cont'd.)

*Multimedia Publ. Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport Comm.*
991 F.2d 154 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 26, 29, 30, 31, 37, 39

*Perry v. Bartlett,*
231 F.3d 155 (4th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rappa v. New Castle Country*
18 F.3d 1048 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rosenberger v. Rector and Visitors of the University of Virginia*
515 U.S. 819 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23, 24, 25, 39

*Republican Party of Minnesota v. White*
536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Sammartano v. First Judicial Court, Etc.*
303 F. 3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33, 34

*Sons of Confederate Veterans, Inc. v. Glendening*
954 F. Supp. 1099 (D. Md.,1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Sons of Confederate Veterans, Inc. v. Holcomb*
129 F. Supp.2d 941 (W.D. Va. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Southeastern Promotions, Ltd. v. Conrad*
 420 U.S. 546 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sypniewski v. Warren Hills Reg. Board of Educ.*
307 F. 3d 243 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32, 33

*Thomas v. Collins*
323 U.S. 516 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Tinker v. Des Moines Indep. School Dist.*
393 U.S. 508 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30, 31, 33

*Turner Broadcasting System, Inc. v. F.C.C.*
512 U.S. 622 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES (Cont'd.)

*U.S. v. Playboy Entertainment Group, Inc.*
529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United Food & Commercial Workers No. 1099 v. Southeastern Ohio Regional Transit Authority*
163 F.3d 341 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

*Virginia v. American Booksellers' Assn., Inc.*
484 U.S. 383 (1988)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Statutes</u>

38 C.F.R. § 1.218 . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 7, 9, 14, 16, 17, 18, 19, 22, 27, 33, 36, 39,
                                                                                          42, 43

38 U.S.C. § 2403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 18, 29, 30, 33

39 U.S.C. § 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 38, 40

# I.

## INTRODUCTION

This case arises out of Plaintiffs' efforts to engage in verbal speech at Point Lookout Confederate Cemetery that defendant Department of Veterans Affairs ("VA") prohibits. As applied to Plaintiffs the VA's speech restrictions violate the First Amendment and pose an imminent threat to Plaintiffs' rights of free speech, especially in connection with a Confederate memorial ceremony scheduled at the Cemetery for June 14, 2003. This Court therefore should issue a preliminary injunction prohibiting the VA from enforcing its speech restrictions against speakers at the Cemetery, and from withholding permission for the Confederate memorial ceremony on the basis of those restrictions.

Plaintiff Patrick J. Griffin, III is a frequent speaker at Confederate memorial services, including that held at the Cemetery each June. He wishes to deliver a speech at the June 14, 2003 ceremony expressing, among other things, his opposition and that of Plaintiffs Sons of Confederate Veterans, Inc ("SCV") and Point Lookout Prisoner of War Association ("PLPOW") to the VA's policy of limiting display of the Confederate flag at the Cemetery to two days a year.

The VA prohibited Mr. Griffin from making remarks at the 2002 ceremony critical of VA flag policy. In reaction to critical remarks delivered at the 2002 ceremony by Fr. Alister Anderson, the VA threatened to ban future ceremonies. The VA has also imposed a censorship scheme, under which all speakers must submit their intended remarks for VA censorship.

The VA has imposed these restrictions under 38 C.F.R. § 1.218(a)(14)(ii), which prohibits "partisan activities" defined as "those involving commentary or actions in support of, or in opposition to, or attempting to influence, any current policy of the Government of the

United States, or any private group or enterprise." It also imposes a blanket prior restraint, regardless of content, on any "oration or similar conduct to assembled groups of people unless the oration is part of an authorized service." The VA has also invoked 38 U.S.C. § 2403(c), which establishes national cemeteries as "national shrines as tribute to our gallant dead...."

The "partisan activities" prohibition violates the First Amendment as applied to Plaintiffs' speech. In a nonpublic forum such as the Cemetery, the VA's speech restrictions must be viewpoint-neutral and reasonable. The "partisan selectively forbids the expression of "particular views" and opinions that support, oppose or attempt to influence, current federal or private policy. The restriction thus forbids certain *viewpoints* and violates the First Amendment. The VA has applied the prohibition to silence only certain viewpoints, such as criticism of the VA.

The VA contends that the prohibition is viewpoint-neutral because it silences not only a given viewpoint, *e.g.* that in opposition to current federal policy, but also the competing viewpoint supporting such policy. The Supreme Court, however, has rejected this argument.

The VA also claims that it wishes to silence plaintiffs' speech to preserve the "decorum," "tranquility" of the Cemetery. This purported concern is a sham. Not a shred of evidence suggests that Plaintiffs' speech will result in any disruptive *conduct* whatsoever. The "partisan activities" prohibition, moreover, permits a speaker to express a wide variety of viewpoints that are just as "disruptive" as those the VA forbids. Further, on the day of the Confederate memorial ceremony, the VA allows display of the Confederate flag, which the VA has characterized in this Court as an incendiary symbol of "racial intolerance and divisiveness." That the VA permits

-2-

display of a symbol *it believes* to be extremely provocative belies any notion that the VA is trying to silence Plaintiffs' speech because it is worried about "decorum," or "tranquility."

Under the reasonableness standard government may only prohibit speech that might actually interfere with the intended use of the forum. By its own admission, the VA has opened the Cemetery on the day of the Confederate memorial service to display of the Confederate flag, which that *the VA claims* to be highly likely to incite disruption. A forum open to such a symbol is also open to Plaintiffs' call before a friendly audience for daily display of the flag.

Further, the absence of any evidence speech is likely to cause disruption has consistently proven fatal to efforts to restrict speech, even in schools and courthouses. As noted above, there is no such evidence here. Courts, moreover, have rejected efforts like the VA's to suppress speech on the grounds that *ideas themselves* -- even ideas like biker symbols -- lack "decorum."

The VA's prohibition on speech "attempting to influence" current federal or private policy is unconstitutional for an additional reason: It allows VA officials to prohibit speech because of the *intent* they attribute to the speaker based on their own subjective interpretation of his words. Such a regulation puts a speaker, "at the mercy of . . . his hearers," and thus violates the First Amendment. For all of the above reasons, the "partisan activities" prohibition is unconstitutional as applied to plaintiffs.

Section 1.218(a)(14)(ii) also prohibits "an oration or similar conduct to assembled groups of people, unless the oration is part of an authorized service." This prohibition is grossly overbroad and unreasonable. It imposes a prior restraint on even the most innocuous discussion among all "groups" at the Cemetery, even if the group is small and their speech is a graveside prayer or friendly greetings. Such a blanket prior restraint is patently unreasonable.

-3-

Finally, in correspondence the VA has imposed unwritten, previously unannounced restrictions on "political" remarks, "commentary on current events" and remarks critical of individuals and organizations. These restrictions cannot be found in any set of published regulations and therefore violate 39 U.S.C. § 901 as well as the First Amendment.

The public interest favors issuance of a preliminary injunction because the public generally benefits from free expression. If the VA is not enjoined from enforcing the "partisan activities" and "verbal speech" restrictions, plaintiffs will be deprived of their First Amendment rights, which constitutes irreparable injury. By contrast, no injury will befall the VA if plaintiffs are allowed to deliver a short speech at the Confederate memorial ceremony, and engage in harmless group discussion while visiting the Cemetery. A preliminary injunction therefore should issue prohibiting the VA from interfering with Plaintiffs's speech or withholding permission for the Confederate memorial ceremony on the basis of its speech restrictions.

## II.

## STATEMENT OF FACTS

**A.    The Cemetery and the Annual Confederate Memorial Ceremony.**

Point Lookout Confederate Cemetery ("the Cemetery") is all-Confederate cemetery where over 3,300 Confederates are buried in a mass grave. The Cemetery is located near the Point Lookout prison camp maintained by the United States during the Civil War. The Cemetery includes a State and a Federal monument to the Confederate dead. *See Griffin v. Dept. of Veterans Affairs*, 129 F. Supp. 2d 832, 834-836 (D. Md.), *reversed,* 274 F. 3d 818 (4th Cir.

2001), *cert denied*, 123 S. Ct. 410 (2002) ("*Griffin I*").[1]  The Cemetery is the site a formal

Confederate memorial service held each June.  One or more formal speeches are delivered at the

ceremony. (Supplemental Declaration of Patrick J. Griffin, III ("Griffin Supp. Decl.") ¶ 9.;

Declaration of Patricia B. Buck  ("Buck Decl." ¶ ¶ 2, 3, Exhs. 1, 2 (speeches given in 1999,

2001).

**B.**     **The Plaintiffs.**

Plaintiff Sons of Confederate Veterans ("SCV") is a non-profit organization devoted to

the preservation of the history of Confederate soldiers.  *Sons of Confederate Veterans, Inc. v.*

*Glendening,* 954 F. Supp. 1099, 1100 (D. Md.,1997).  The SCV has been involved in litigation

over license plates bearing the SCV's Confederate battle-flag logo. *Id.*;  *Sons of Confederate*

*Veterans, Inc. v. Holcomb,* 129 F. Supp.2d 941, 944 (W.D. Va. 2001), *aff'd* 288 F.3d 610 (4th

Cir. 2002.  Captain Vincent J. Camalier Camp No. 1359 of the SCV ("Camalier Camp") is the

organizational sponsor of the annual Confederate memorial ceremony at the Cemetery.

(Declaration of J.B. Couch ("Couch Decl.") ¶ 2.)

Plaintiff Point Lookout Prisoner of War Association ("PLPOW") is an independent,

nonprofit historical organization with its headquarters in Newport News, Virginia. PLPOW's

mission is to honor the Confederate soldiers who were imprisoned at Point Lookout and those

who died there.  Its president is Patricia B. Buck  (Buck Decl. ¶¶ 1, 2.)  PLPOW sponsors an

annual pilgrimage to Point Lookout, part of which is the Confederate memorial service at the

Cemetery.  (*Id.* ¶ 2.)  PLPOW and SCV members visit the Cemetery in small, informal groups at

---

[1]  Plaintiffs recognize that the Court is familiar with the Cemetery and the litigation
between Mr. Griffin and the VA over display of the Confederate flag.

the time of the pilgrimage and engage in speech in connection with those visits, including speech in opposition to VA flag policy. (Buck Decl. ¶ 7; Griffin Supp. Decl. ¶ 5.)

Plaintiff Patrick J. Griffin, III is a lifetime member and past commander-in-chief of the SCV. (Griffin Supp. Decl. ¶ 1.) He has been involved in litigation against the VA over his right to display a historically accurate Confederate battle flag at the Cemetery. *Griffin I*; *Griffin v. Secretary of Veterans Affairs*, 288 F.3d 1309, 1321-1322 (Fed. Cir.), *cert. denied*, 120 S. Ct. 410 (2002) (*"Griffin II"*); *Holcomb*, 288 F. 3d 610; *Glendening*. Mr. Griffin is a regular visitor to the Cemetery and other national cemeteries.   (Griffin Supp. Decl. ¶ 3.)  The places where Confederate soldiers are buried are, in Mr. Griffin's view,  places of special emotional significance for those who honor the Confederate dead. (*Id.* ¶ 4.) Mr. Griffin delivers speeches at VA cemeteries in connection with memorial ceremonies. (*Id.* ¶ 8.) In 2001 and 2002, Mr. Griffin delivered a formal speech at the Confederate memorial ceremony. (*Id.* ¶ 9.)

When he visits such cemeteries as part of an SCV or other group, Mr. Griffin engages in, and listens to, conversation with other group members.  On some of these occasions he recites a prayer or short address in honor of the memory of the soldiers buried there. ( *Id.* ¶ 5.) Mr. Griffin has no intention of clearing these remarks with the VA in advance and could not do so in any event since most of the discussion is impromptu and not known in advance. (*Id.* ¶ 6.)

C.    **The Defendants**

National cemeteries, including Point Lookout and Loudon Park, are under the control of defendant Department of Veterans Affairs ("VA") acting through its National Cemetery Administration ("NCA").  The defendants in this action are the VA and two of its officials,

Roger R. Rapp and Kenneth Stoner in their official capacities only.  Mr. Rapp is the director of

the NCA.  Mr. Stoner is the director of the Cemetery.  (Griffin Decl. ¶ 11.)

**D.**     **The Dispute.**

     **1.**     **The Dispute over Formal Speeches at the Confederate Memorial Service.**

       **a.**     **The VA's Prohibition of Mr. Griffin's June 8, 2002 Speech.**

Mr. Griffin sought to deliver an address at the June 8, 2002 memorial service at Point

Lookout.  A true and correct copy of Mr. Griffin's intended remarks is attached as Exhibit 1 to

his Supplemental Declaration. Among other things, Mr. Griffin sought to express opposition to:

(1) the VA's policy of prohibiting display of the Confederate flag 363 days a year; (2) the

overbreadth of § 1.218(a)(14), which according to a federal appellate judge is so "grossly

overbroad" that it resembles a "law school examination in which law students are invited to find

the maximum number of serious constitutional issues raised by a hypothetical ordinance"[2]; (3)

the VA.'s failures to maintain Point Lookout adequately or provide adequate, safe parking; (4)

the VA.'s misallocation of public resources into litigation designed to defeat the First

Amendment rights of citizens instead of maintenance of Point Lookout; and (5) the VA's

bureaucratic culture that in Mr. Griffin's view deprives citizens of the right to speak while

maintaining anonymity of the officials involved.

In view of the VA's prohibition on speech in opposition to current policy of the federal

government, it was unclear whether the VA might try to impose criminal sanctions on him for his

intended remarks. (Griffin Supp. Decl. ¶ 9.)  On May 24, 2002, Plaintiffs' counsel sent the VA a

letter, along with the text of Mr. Griffin's intended remarks. (*Id.* ¶ 10, Exhs. 1, 2; Declaration of

---

    [2] *Griffin II,* 288 F. 3d at 1331 (Dyk, J., concurring).

Michael F. Wright ("Wright Decl." ¶ 3.) In the letter, counsel argued that the "partisan activities" and "orations" portions of § 1.218(a)(14) were unconstitutional as applied to Mr. Griffin's intended remarks and other similar speech, and should be withdrawn. As the ceremony approached, Mr. Griffin sought clarification of his rights in this Court. (Griffin Supp. Decl. ¶ 10.)

On June 5, 2002, as this action was being filed, the VA responded to counsel's letter of May 24, 2002. (Griffin Supp. Decl. ¶ 10, Exh. 4; Wright Decl. ¶ 3) The VA's General Counsel Tim S. McClain stated that the request for approval of the ceremony (which was made by the Vincent Camalier Camp, Sons of Confederate Veterans) "made no mention of your client's [intended] speech" and was approved on the grounds that it would be a ceremony honoring the Confederate dead, not criticizing VA policy.[3] Mr. McClain stated that Mr. Griffin's intended "political" remarks, which Mr. McClain did not specify, "would not be consistent with maintaining the decorum of a national cemetery . . . ." "We therefore expect that your client will revise his proposed remarks and limit them to paying tribute to those who rest within the hallowed grounds of Point Lookout Confederate Cemetery." (Id.) At the same time, the VA threatened the Camalier Camp. (Couch Decl. ¶ 3, Exh. 1.) Defendant Roger Rapp wrote camp commander J.B. Couch that if Mr. Griffin gave his intended remarks it would jeopardize the camp's ability obtain approval for future ceremonies. (Id.) Mr. Couch forwarded the letter on to Mr. Griffin. (Griffin Supp. Decl. ¶ 10, Exh. 3.)

---

[3] Mr. McClain assumed that "political" speech or that which opposes federal policy cannot also be speech that honors the Confederate dead.

**b.    The June 7, 2002 TRO Hearing and the Modification of Mr. Griffin's and Mrs. Buck's Speeches.**

On June 6, 2002, plaintiffs filed this action.[4] The next day they sought a temporary restraining order against enforcement of § 1.218(a)(14) against Mr. Griffin's speech at the June 8, 2002 ceremony. Central to Mr. Griffin's arguments was that the VA's prohibition on "partisan activities" was viewpoint-based. In opposition, the VA argued that the "partisan activities" prohibition was viewpoint-neutral because it prohibited speech "in support of" as well as "in opposition to" current federal and private policies. The VA also argued that Mr. Griffin's proposed remarks would disrupt the tranquility of the Cemetery. (VA Opp. to TRO at 17.) The Hon. Andre Davis presided at the TRO hearing. Judge Davis denied the TRO, largely on the grounds that the "partisan activities" prohibition purportedly was viewpoint-neutral. Faced with the VA's threats to prosecute him if he delivered his intended remarks and in the absence of protection from this Court, Mr. Griffin amended his remarks. (Griffin Supp. Decl. ¶ 10, Exh. 5.)

**c.    Fr. Anderson's Speech and the VA's Censorship Scheme.**

The main speaker at the 2002 Point Lookout ceremony was Fr. Alister Anderson. His theme before an enthusiastic audience (Griffin Supp. Decl. ¶ 11; Buck Decl. ¶ 9) was that the Confederate soldier fought for "freedom, liberty and limited and local government," and "the right of all men to freely govern themselves." These values, he said, are rooted in the Judeo-Christian religious tradition and are under attack in contemporary society, along with Confederate history itself. Fr. Anderson sought to account for the state of Confederate heritage

---

[4] The original plaintiffs were Mr. Griffin and the Maryland Division of the SCV, a Maryland non-profit corporation. The national organization of the SCV and the PLPOW took the place of the Maryland Division via the First Amended Complaint.

in contemporary society and to admonish his listeners to vindicate the values for which, in his view, Confederate soldiers fought. (*See* Anderson speech, Griffin Supp. Decl. ¶ 11, Exh. 6; Buck Decl. ¶ 3, Exh. 3.) The text on which Fr. Anderson based his remarks was General Stephen D. Lee's charge to the then-newly formed Sons of Confederate Veterans. (Quoted in Griffin Supp. Decl. ¶ 15.) General Lee called on SCV members to vindicate the Confederate cause and the Confederate soldier's good name; to guard his history; and present the true history of the South to future generations.

Fr. Anderson first asked who are these members of the SCV whom General Lee admonished to vindicate the Confederate cause. (The portions of Fr. Anderson's speech to which the VA later objected are highlighted; other portions are quoted to provide context.)

. . . [F]or many years members of the SCV and [Military Order of the Stars and Bars][5] were men who had fought in WWI, went through the Great Depression and fought again in WWII. The vast centralization of power in the Federal Government, which began with President Lincoln, increased profoundly in WWI and continued under President Franklin Roosevelt in the Great Depression and in WWII....[Members of the SCV] were all too willing to let 'by-gones be by-gones' and to forget that the South's struggle of war against the North was a struggle for a Righteous Cause and not just an unfortunate Lost Cause. The end result of this attitude was that for many years membership in the SCV dwindled down dramatically. Therefore when the 'Great Society' program of President Lyndon

---

[5] An organization affiliated with the SCV and composed of descendants of Confederate officers.

Johnson took hold of the country, the *white liberal socialists and elitist activists of the country sponsored and nurtured attacks on all the traditional aspects of our nation.* Today they continue to attack and vilify our ancestors and our Southern history and culture.

When General Lee says 'you' in his Charge, we must remember that 'you' means you and me today . . . . We newer members are men who look at the United States differently than most of our elders. *We grew up with WWII, the Korean War, the Vietnam War, the rise of uncontrolled Feminism, the ugly, demonic Sexual Revolution and the ever-increasing octopus-like domination and control of the Federal Government.* We newer members of the SCV are repudiating the false, bigoted, revisionist histories of our country that generations before us were forced to read and were brainwashed into believing! *We are opposed to the enormous growth of the bureaucratic Federal Government and the great centralization of absolute power in Washington, D.C.* We look back to those days when our ancestors were proud of being Southerners. We are citizens of the United States and loyal to our country, but we are just as proud to be Southerners and members of a particular state. We are Americans by birth and citizenship, but we are Southerners by the Grace of God. We look to that time when our Confederate ancestors fought to maintain our Southern culture and heritage and the truly constitutional form of government in which they believed and for which they then bled, sacrificed and died.

Fr. Anderson said that General Lee charged the SCV with "vindication" of the Confederate cause, which in Fr. Anderson's opinion was "the right of all men to freely govern themselves in

society." The loss of the war brought on Reconstruction, which Fr. Anderson called:

> ... the lowest, filthiest and most demonic period in the history of the United States. It was the nadir of disgrace. It was anything but reconstruction. It was the total destruction of everything Southern. It took away every vestige of human freedom for the white Southerner. It was a genocide and a holocaust of a whole people. It was the brutal demonic force of a radical Federal Government gone amuck .... By far the worst thing that happened through the Northern Federal government's plan to reconstruct the South was the creation of increasing disharmony between the newly freed Negroes and the White population. The vicious, revengeful radical Northern Republicans caused whatever and wherever bad race relations still exist in our country today. Reconstruction produced legitimate fear and anger in the war-torn and politically deprived South. It caused the enactment later of many of the Jim Crow laws of th South. It caused the terrible formation of Black ghettos in the North.

Fr. Anderson criticized "timid, politically correct, brain-washed new-style Southerners" who are unwilling to defend their Confederate forbears. He criticized the NAACP for its "Declaration of War against our Confederate soldier's good name and his flag." At the same time he praised Curtis Milteer, the African-American mayor of Suffolk, Virginia, who "rejected Virginia Governor Mark Warner's decision not to issue a proclamation honoring Confederate Heritage Day in Virginia last month." Mayor Milteer "responded to Governor Warner's cowardly and politically correct decision by issuing a proclamation in Suffolk City declaring that April was Confederate History Month." Fr. Anderson also praised African-American writer Nessa B. Johnson, who is descended from Confederate veterans. Ms. Johnson recently accepted an

invitation to join the United Daughters of the Confederacy. Fr. Anderson closed by calling on his audience to return to traditional religious values for which he believes Confederate soldiers fought.

On or about August 9, 2002, J.B. Couch, then-commander of the Capt. Vincent J. Camalier Camp, SCV, ("Camalier Camp") that sponsors the Point Lookout ceremony, received a letter from the VA's Roger Rapp (Couch Decl., Exh. 2) in which he stated:

> . . . [W]e must call to your attention conduct during this year's authorized memorial service at the cemetery that is a cause for concern. Specifically, a participant in the memorial service, Reverend Alistair Anderson, gave a speech containing remarks that are inappropriate in a national cemetery.
>
> Reverend Anderson's remarks included the following: (1) lamenting what he described as 'white liberal socialists and elitist activists of the country [who have] sponsored and nurtured attacks on all traditional aspects of our nation'; (2) criticizing 'the rise of uncontrolled feminism, the ugly, demonic sexual revolution and the ever-increasing octopus-like domination and control of the Federal Government' and (3) declaring that SCV members should oppose 'the enormous growth of the bureaucratic Federal Government and the great centralization of absolute power in Washington, D.C.'
>
> Reverend Anderson went on to express personal views that were critical of a number of individuals and organizations including the National Association for the Advancement of Colored People, the Southern Poverty Law Center, and the Governor of the State of Virginia. Much of the Reverend Anderson's speech was

devoted not to honoring the Confederate prisoners buried at Point Lookout
Confederate Cemetery, but rather to commentary on current events and other
statements of a partisan nature.

Pursuant to 38 U.S.C. § 2403(c), all national cemeteries 'shall be
considered national shrines as a tribute to our gallant dead.' Further, VA
regulations governing conduct at VA facilities specifically preclude 'partisan
activities, i.e. those involving commentary or actions in support of, or in
opposition to, or attempting to influence, any current policy of the Government of
the United States, or any private group, association, or enterprise.' 38 C.F.R.
§ 1.218(a)(14)(ii). The remarks by Reverend Anderson referenced above clearly
constituted partisan activity within the meaning of the regulation and were not in
keeping with maintenance of the cemetery as a national shrine to the honored dead
interred there. We trust you understand such remarks have no place in a national
cemetery.

Mr. Rapp concluded his letter as follows:

"VA wishes to continue working with the Camalier Camp, and other
organizations, to honor those buried at Point Lookout Confederate Cemetery. *To do
so, however, we must have your organization's assurance that it will make its best
efforts to avoid statements of a partisan or political nature from taking place during
authorized memorial services conducted by your organization at the cemetery. VA
will take into account failure to provide such assurance when it considers future
requests to hold such services. Further, we ask that your organization include, with*

-14-

*any future requests for permission to hold memorial services at Point Lookout*

*Confederate Cemetery, a schedule of events along with a brief summary of the*

*intended remarks of any speakers.  Please keep in mind that any such request must*

*be submitted to the cemetery director at least 30 days in advance of the proposed*

*event.*" (Emphasis added.)

The Camalier Camp has included Mr. Griffin as a speaker at the June 14, 2003 ceremony. It has asked him to submit the text of his remarks for review to comply with VA restrictions. (Griffin Supp. Decl. ¶ 12, Exh. 8.)  The VA in turn has asked the Camalier Camp to provide "more documentation" to assure that "remarks made at last year's ceremony, which were not appropriate for a memorial ceremony held in a national cemetery," are not repeated. (Wright Decl. ¶ 4, Exh. 1.)  In an effort to meet the VA's censorship requirements, the camp has instructed Mr. Griffin not to include any references to litigation with the VA. (Griffin Supp. Decl., ¶ 12, Exh. 8.)

### d.     Mr. Griffin's Proposed June 14, 2003 Speech.

Mr. Griffin has composed a draft of his remarks for June 14, 2003, entitled "Honoring Confederate Soldiers on Flag Day." (Griffin Supp. Decl. ¶ 13, Exh. 9.)  Mr. Griffin believes that honoring Confederate soldiers is not just a matter of praising past virtues but of defending the Confederate cause in the present. (*Id.* ¶¶ 15-17.)  The theme of Mr. Griffin's remarks is that the Confederate flag is an American soldier's flag that should be flown every day at the Cemetery, just as other American flags are flown over American soldiers' graves.  He criticizes groups who in his view desecrate the flag in their efforts to associate it with their agendas.  He states that VA regulations prohibiting daily display of the Confederate flag are wrong.  He closes by saying that

-15-

the United States and Confederate flags should fly together, with the Confederate flag set just a little lower "to show that the Confederate soldiers we honor today contributed much to this greatest of countries." Mr. Griffin has omitted other remarks he would like to make. (*Id.* ¶ 13.) He also anticipates that he may have to submit his remarks to VA censorship, although he feels very uncomfortable about doing so. (*Id.* ¶ 18.)

### 2.    The Dispute over Informal Speech at the Cemetery on Other Occasions.

Both Mr. Griffin and other members of the PLPOW and SCV make informal visits to the Cemetery apart from the memorial ceremony. Often these visits are made by small groups of people who engage in various forms of speech, including prayers for the Confederate dead; discussion about the Civil War; and remarks critical of VA restrictions on display of the Confederate flag and speech generally. (Griffin Supp. Decl. ¶¶ 4-5; Buck Decl. ¶ 7.) PLPOW members make such informal visits in connection with the annual PLPOW pilgrimage in June. (Buck Decl. ¶ 7.) Members of such groups cannot obtain advance permission for their group conversations from the VA. Many of the visits are impromptu and often the participants do not know what they are going to say before speech among group members occurs. (Griffin Supp. Decl.¶¶ 5-6; Buck Decl. ¶ 7.)

Section 1.218(a)(14) forbids "any oration or similar conduct to assembled groups of people unless the oration is part of an authorized service . . . ." The speech in which Mr. Griffin, Ms. Buck and members of the plaintiff organizations engage appears to fall within the literal scope of this prohibition. (Griffin Supp. Decl. ¶ 7; Buck Decl. ¶ ) A cloud thus hangs over the speech of small groups of visitors at VA cemeteries.

**3.     No Improper Conduct has Occurred in Connection with the Confederate Memorial Service or Other Visits by Plaintiffs to the Cemetery.**

For over thirty-five (35) years, Mr. Griffin has visited VA and other cemeteries where Confederate soldiers are buried. (Griffin Supp. Decl. ¶ 3.)  At no time during any of these visits, including his visits to the Cemetery and in particular on the occasions of his speeches and those of Fr. Anderson has "any conduct destructive of property or injurious to persons occurred." (*Id.* ¶ 22.)  Ms. Buck confirms that speech at the Cemetery, including that in opposition to VA policies, is conducted in normal tones.  Such speech is not accompanied by any conduct injurious to persons or property. (Buck Decl. ¶ 9.)

**E.     The VA's Written Speech Regulations.**

The VA regulates verbal speech in national cemeteries under 38 C.F.R § 1.218(a)(14):

(14) Demonstrations.

(i)  All visitors are expected to observe proper standards of decorum and decency while on VA property.  Toward this end, **any service, ceremony, or demonstration, except as authorized by the head of the facility or designee, is prohibited**.  Jogging, bicycling, sledding and other forms of physical recreation on cemetery grounds is [sic] prohibited.

(ii)  For the purpose of the prohibitions expressed in this paragraph, unauthorized demonstrations or services shall be defined as, but not limited to, picketing, or similar conduct on VA. property; *any oration or similar conduct to assembled groups of people, unless the oration is part of an authorized service*; the display of any placards, banners, or foreign flags on VA. property unless approved by the

-17-

head of the facility or designee; disorderly conduct such as fighting, threatening, violent, or tumultuous behavior, unreasonable noise or coarse utterance, gesture or display or the use of abusive language to any person present; and partisan activities *i.e. those involving commentary or actions in support of, or in opposition to, or attempting to influence, any current policy of the Government of the United States, or any private group, association, or enterprise.* (Emphasis added.)

Also relevant to this case is 38 U.S.C. § 2403(c), which provides:

(c) All national and other veterans' cemeteries under the control of the National Cemetery Administration shall be considered national shrines as a tribute to our gallant dead and, notwithstanding the provisions of any other law, the Secretary is hereby authorized to permit appropriate officials to fly the flag of the United States of America at such cemeteries twenty-four hours each day.

**F.**    <u>**Those Who Violate the Speech Restrictions of § 1.218(a)(14) Face Possible Fine and Imprisonment**</u>.

Section 1.218 (b) subjects those who violate the VA.'s speech restriction "to arrest and removal from the premises." Those who engage in an "[u]nauthorized demonstration or service in a national cemetery or on other VA property" are subject to "a term of imprisonment of not more than six months" and a fine of $250.00. <u>See</u> § 1.218(b), (b)(9).

## III.

## THE FIRST AMENDED COMPLAINT

The First Amended Complaint sets forth four claims for relief. The first claim challenges the VA's application of the "partisan activities" prohibition of § 1.218(a)(14) to verbal speech at the Cemetery.   Plaintiffs' second claim seeks to prevent the VA from suppressing verbal speech at the Cemetery under the "orations" prohibition of § 1.218(a)(14).  The third claim challenges the VA's new prohibitions on "political remarks," "commentary on current events" and "personal views" critical of persons or organizations as set forth in the VA's June and August, 2002 letters. The fourth claim challenges the VA's censorship requirement.

## IV.

## THE STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

In deciding whether to issue a preliminary injunction, the Court weighs four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted;  (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 416-417 (4th Cir. 1999).  Plaintiffs will turn first to the merits.

## V.

## THE VA's SPEECH RESTRICTIONS AND CENSORSHIP REQUIREMENT

## VIOLATE THE FIRST AMENDMENT

A.    <u>The VA's Speech Restrictions must be Viewpoint-Neutral and Reasonable.</u>

Prior litigation has established that the Cemetery is a nonpublic forum.  *Griffin I,* 129 F. Supp. 2d at  839-840; *Griffin II*, 288 F.3d at1321-1322.   In a non-public forum, speech

-19-

regulations must be viewpoint-neutral and reasonable in light of "the purpose of the forum and all the surrounding circumstances." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806, 809, 105 S.Ct. 3439, 3451 (1985); *Lamb's Chapel v. Center Moriches Union Free School Dist*, 508 U.S. 384, 392-393, 113 S. Ct. 2141 (1993).

Government may exclude expression of a subject matter from a nonpublic forum where the exclusion is necessary to preserve the forum for "the limited and legitimate purposes for which it was intended." *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510 (1995). But viewpoint neutrality requires government to "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* In other words, government may not exclude speech based on "the particular views taken by speakers on a subject...." *Id.* "[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806. The Court thus recognizes a distinction between legitimate exclusion of an entire subject matter and improper viewpoint discrimination, although the Court has recognized that the distinction is "not a precise one." *Id.* at 831.

The reasonableness requirement permits government "to restrict speech [only] to the degree reasonably necessary to preserve the forum for its intended use." *Multimedia Publ. Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport Comm.*, 991 F.2d 154, 162 (4th Cir. 1993) ("*Multimedia*"). To determine the forum's "intended use," the court looks not only at "the government's assertions of purpose, but also at the facility's actual operation." *Id.* at 162-163. A forum may have "more purposes than [its] primary one." *Id.* In *International Society for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 687, 113 S. Ct. 2141 (1992) (O'Connor, J.,

concurring), Justice O'Connor further explained the nature of the reasonableness requirement:

> 'The reasonableness of the Government's restriction [on speech in a nonpublic
>
> forum] must be assessed in light of the purpose of the forum and all the surrounding
>
> circumstances.' [Citation omitted.] '[C]onsideration of a forum's special attributes
>
> is relevant to the constitutionality of a regulation since the significance of the
>
> governmental interest must be assessed in light of the characteristic nature and
>
> function of the particular forum involved.'

A determination of reasonableness includes evaluation of "[t]he degree and character of

the impairment of protected expression," "the validity of any asserted justification," which if

found valid is "then weighed against the impairment." *Multimedia*, 991 F. 2d at 159.   The

government must show that the prohibited speech "might actually interfere with the carrying out

of [the forum's] purposes." *Id.* Government may not "ban all speech not directly advancing the

forum's intended purpose." *Id.* at162.   "Much nondisruptive speech--such as the wearing of a T-

shirt or button that contains a political message--may not be '[forum-] related,' but is still

protected speech even in a nonpublic forum." *Board of Airport Commissioners v. Jews for*

*Jesus, Inc.,* 482 U.S. 569, 576, 102 S.Ct. 2568 (1987).

**B.**  **Defendants Bear the Burden of Demonstrating that the VA's Speech Restrictions**

  **Meet Constitutional Standards.**

"When the Government restricts speech, [it] bears the burden of proving the

constitutionality of its actions." *U.S. v. Playboy Entertainment Group, Inc.* 529 U.S. 803, 816,

120 S.Ct. 1878, 1888 (2000). "Discrimination against speech because of its  message is

-21-

presumed to be unconstitutional." *Rosenberger,* 515 U.S. at 828. The government does not meet

its burden of justifying its speech restrictions by mere assertion. *Multimedia,* 991 F. 2d at 160-

161. Government must "prove the links in its chain of reasoning" for restricting speech. *United*

*Food & Commercial Workers No. 1099 v. Southeastern Ohio Regional Transit Authority,* 163

F.3d 341, 357-358 (6th Cir. 1998) ("*UFCW*"). "[U]ndifferentiated fear" or speculation that

speech might interfere with the intended use of the forum, without evidence that such a threat is

real and substantial, will not sustain a speech prohibition. *Cohen v. California,* 403 U.S. 15, 23,

91 S. Ct. 1780, 1787 (1971); *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. 508, 508, 89 S.

Ct. 733, 737 (1969).

Courts must exercise independent judgment to make sure that restrictions on First

Amendment rights are backed up by evidence or at least sound reasoning. *Turner Broadcasting*

*System, Inc. v. F.C.C.,* 512 U.S. 622, 666, 114 S.Ct. 2445 (1994); *UFCW,* 163 F.3d at 357. Nor

does the mere existence of reasonable grounds end the inquiry. "The existence of reasonable

grounds for limiting access to a nonpublic forum... will not save a regulation that is in reality a

facade for viewpoint-based discrimination." *Cornelius v. NAACP Legal Defense and*

*Educational Fund, Inc.* 473 U.S. 788, 811, 105 S.Ct. 3439 (1985).

## C.    The "Partisan Activities" Prohibition Violates the Viewpoint-Neutral Requirement.

### 1.    The Prohibition Selectively Prohibits Disfavored Viewpoints.

Section 1.218(a)(14) prohibits "partisan activities," which it defines as "those involving

commentary or actions in support of, or in opposition to, or attempting to influence, any current

policy of the Government of the United States, or any private group, association or enterprise."

The VA does not prohibit all discussion of "current policy of the Government of the United

States, or any private group, association or enterprise." It bans only certain "particular views taken by speakers" on such policy. *Rosenberger*, 515 U.S. at 829. One can discuss current policy of the federal government or a private group without supporting, opposing or trying to influence such policy. For example, without supporting or opposing such policies, a speaker could simply describe them, pointing out the number of federally owned cemeteries in which Confederate dead are interred. A speaker could also express a historical viewpoint on current federal policies, tracing their development over time to the government's present ownership of many cemeteries that contain Confederate graves and monuments. One could similarly describe the policies of private groups like the United Daughters of the Confederacy of decorating Civil War graves of both sides and trace their historical development without supporting, opposing or trying to influence such policies. The "partisan activities" prohibition therefore is not an exclusion of an entire subject matters of current federal or private policies. It is instead an exclusion only of certain "opinions" or "perspectives" or "particular views" on those subjects. *Rosenberger*, 515 U.S. at 829. It is thus a prohibition on certain *viewpoints*, which violates the First Amendment.

That the "partisan activities" prohibition is viewpoint-based becomes even more obvious when one breaks the prohibition down into its parts. For example, a prohibition on speech in opposition to government or private policy clearly is viewpoint-based. The same is true of a ban on speech supportive of such policy (although government probably would be more likely to "crack down"on criticism rather than praise), or speech intended to influence it. Each part of the "partisan activities" thus prohibits a viewpoint or a group of viewpoints. The prohibition is the sum of these viewpoint-discriminatory parts and thus is entirely viewpoint-discriminatory.

**2.**    **The Supreme Court has Rejected the VA's Argument that the Prohibition is**
**Viewpoint-Neutral.**

The VA contends that the "partisan activities" prohibition is viewpoint-neutral because it prohibits both the viewpoint "in support of" and that "in opposition to" federal or private policy. By prohibiting both sides of the discussion, the VA argues, the prohibition achieves viewpoint neutrality. The Supreme Court has *explicitly rejected* the VA's argument. In *Rosenberger*, the plaintiff-editors of a student Christian publication called "Wide Awake" alleged that a restriction on university reimbursement for student groups' printing costs violated the First Amendment. The restriction prohibited reimbursements for "religious activity," which it defined as "activity that 'primarily promotes or manifests a particular belief in or about a deity or ultimate reality.'" *Id.* 515 U.S. at 825. The dissent argued that the university's policy was viewpoint-neutral:

> . . . There is no viewpoint discrimination in the University's application of its Guidelines to deny funding to Wide Awake . . .   The discussion of Wide Awake's content . . . shows beyond any question that it 'primarily promotes or manifests a particular belief(s) in or about a deity . . .,' in the very specific sense that its manifest function is to call students to repentance, to commitment to Jesus Christ, and to particular moral action because of its Christian character.

> *If the Guidelines were written or applied so as to limit only such Christian advocacy and no other evangelical efforts that might compete with it, the discrimination would be based on viewpoint.* But that is not what the regulation authorizes; it applies to Muslim and Jewish and Buddhist advocacy as well as to Christian.   And since it limits funding to activities promoting or manifesting a

particular belief not only 'in' but 'about' a deity or ultimate reality, it applies to agnostics and atheists as well as it does to deists and theists . . . . *The Guidelines, and their application to Wide Awake, thus do not skew debate by funding one position but not its competitors. As understood by their application to Wide Awake, they simply deny funding for hortatory speech that 'primarily promotes or manifests' any view on the merits of religion; they deny funding for the entire subject matter of religious apologetics. Id.* at 895-896. (Emphasis added.)

The dissent's argument is the same as the VA's in this case. Both defend a speech restriction on the grounds that it excludes not only a given view (Christianity in *Rosenberger*; opposition to VA flag policies here) but also the competing viewpoint or class of viewpoints. The *Rosenberger* majority squarely rejected the dissent's -- and the VA's -- argument:

The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. *It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint. The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways. Id.* at 831-832. (Emphasis added.)

The VA's argument that the "partisan activities" prohibition does not discriminate on the

basis of viewpoint because it even-handedly silences opposing views thus is directly contrary to Supreme Court authority. The prohibition discriminates against multiple viewpoints and thus violates the First Amendment as applied to verbal speech at the Cemetery.

3. **The VA's Purported Concern with "Decorum" and "Tranquility" is a Transparent Facade for Viewpoint Discrimination.**

a. **The Underinclusiveness of "Partisan Activities" Belies any Genuine Concern with "Decorum" or "Tranquility."**

The court may reject government's justifications for prohibiting speech if they are really a facade for viewpoint discrimination. *Cornelius*, 473 U.S. at 811; *Multimedia*, 991 F. 2d at 162 (asserted justifications rejected as*"post hoc*, pretextual creations"). The VA claims that expression critical of government and private policy threatens the decorum and tranquility of the Cemetery. In this regard, the "partisan activities" prohibition is significant for what it does *not* prohibit. "Underinclusiveness, "i.e. exemptions from a speech regulation, may "diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo,* 512 U.S. 43, 52-53, 114 S.Ct. 2038, 2044 (1994); *Republican Party of Minnesota v. White* 536 U.S. 765, 122 S.Ct. 2528, 2537 (2002) (restriction on judicial candidates' disclosure of views "so woefully underinclusive as to render belief in [alleged] purpose [underlying regulation] a challenge to the credulous"); *Florida Star v. B.J. F.*, 491 U.S. 524, 541-542, 109 S.Ct. 2603, 105 L. Ed.2d 443 (1989) (SCALIA, J., concurring) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.")

The VA's decorum/tranquility argument rests on the assumption that the forms of speech

§ 1.218(a)(14) prohibits are more likely to "disrupt" the Cemetery than speech the VA permits. This assumption is patently erroneous. For example, § 1.218(a)(14) does not prohibit speech critical of *former* policies of the federal government. It does not prohibit criticisms of *past or present* policies of state, local or foreign governments, or the conduct of private individuals. Thus if a speaker at the Cemetery works his audience into a rage over the federal government's maltreatment of Confederate prisoners or the evils of Reconstruction, he does not violate § 1.218(a)(14). If a speaker blasts a local government with all the barbed rhetoric he can muster for removing a Confederate monument, he does not violate § 1.218(a)(14). But he may spend six months in federal prison if he praises the VA's preservation of Confederate graves but politely criticizes its restrictions on display of the Confederate flag. The speech the VA permits therefore is just as likely to disrupt the Cemetery as the speech it prohibits as "partisan activities."

If the VA seeks to restrict speech in order to avoid "controversy," it must do so in a viewpoint-neutral fashion. *Cornelius,* 473 U.S. at 811; *Arkansas Educ. Television Comm. v. Forbes,* 523 U.S. 666, 676, 118 S.Ct. 1633, 1640 (1998). As shown above, the "partisan activities" prohibition is based squarely on viewpoint, not the "controversial" nature of the forbidden speech. The purpose of the prohibition thus is not to preserve decorum or tranquility.

The VA's highly selective objections to Fr. Anderson's speech further underscore the speciousness of its "decorum" and "tranquility" arguments. The VA objected (Couch Decl. Exh. 2) to Fr. Anderson's critical remarks on the influences that shaped the attitudes of SCV members, such as the sexual revolution, feminism and the Great Society. But the VA did not object to Fr. Anderson's excoriation of certain contemporary Southerners. It objected to Fr. Anderson's characterization of "White liberal socialists and elitist activists" of the 1960's and

today, but not to his call for a return to traditional religious values. One could multiply the examples further, but the point is clear: The VA's concern is not avoiding controversy or preserving decorum and tranquility but suppression of disfavored viewpoints.

      **b.**    **The VA has Opened the Confederate Memorial Service to Speech it Views as Far More Inflammatory than the Verbal Speech in this Case.**

The VA allows display of Confederate flags at the annual Confederate memorial ceremony. *Griffin I*, 274 F. 3d at 823. In *Griffin I*, the VA argued again and again that in its view, the Confederate flag is a "symbol of racial intolerance and divisiveness." *Id.* 129 F. Supp. 2d at 843 (noting VA's "continual reference to the Confederate flag as a symbol of racial intolerance and divisiveness"). "Given the flag's historical roots," the VA maintained, "that perception [of the flag] is not unreasonable." (VA Opp. to Motion for Preliminary Injunction, November 3, 2000, at 29; Wright Decl. ¶ 5.) The VA further argued: "Given that the Confederate battle flag *symbolizes the South's attempt to leave the country and, thus, to perpetuate the slavery of black persons*, it should not be surprising that the Confederate battle flag is often perceived today as a symbol of racial intolerance and divisiveness." (*Id.* at 30) (Emphasis added.))

The messages the *VA itself associates* with the Confederate flag are among the most incendiary in contemporary society. The VA cannot claim with a straight face that it is concerned about a lack of "decorum" in Mr. Griffin's speech the Cemetery or threats to "tranquility" in Fr. Anderson's criticism of liberals and socialists when it allows display of what *it considers* a far more disruptive symbol at the Confederate memorial ceremony. Indeed, if the

VA was sincere when it argued the above positions in this Court, one can only conclude that the VA is supremely *unconcerned* about decorum and tranquility at the memorial ceremony.

Plaintiffs of course strongly disagree with the VA's characterization of the flag. In Plaintiffs' view, this Court's findings on the way a "rationally thinking person" would view the flag in the Cemetery are absolutely right. *Griffin I*, 129 F. Supp. 2d at 841. But the issue here is not whether the VA's perceptions are correct. The issue is what *actually motivates* the VA's application of the "partisan activities" prohibition and § 2403(c) in this case: Is it the desire to maintain "decorum" and "tranquility" or the desire to suppress disfavored ideas? Plaintiffs submit that the VA's own arguments show that its real agenda is the latter. Its purported concern about the former is a facade and a pretext.

**D.    Application of the "Partisan Activities" Prohibition to Plaintiffs is Unreasonable.**

**1.    Exclusion of Mr. Griffin's and Fr. Anderson's Remarks is not Necessary to Preserve the Forum for its "Intended Use" as a Forum for what the VA Considers an Extreme Form of Provocative and Controversial Speech.**

The reasonableness of the "partisan activities" prohibition "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Lee*, 505 U.S. at 687. The VA may restrict speech only "to the degree reasonably necessary to preserve the forum for its *intended use*." *Multimedia*, 991 F. 2d at 162. (Emphasis added.)   As discussed above, on the day of the Confederate memorial ceremony, the Cemetery is open to display of the Confederate flag, which *in the VA's opinion* is a highly incendiary symbol of "racial intolerance and divisiveness." *Griffin I*, 129 F. Supp. 2d at 843. The VA thus "intended" for the Cemetery to be used, in connection with the Confederate memorial ceremony, as a forum for extreme and highly

-29-

provocative forms of speech. It follows that exclusion of Fr. Anderson's and Mr. Griffin's relatively innocuous remarks is not necessary to preserve the Cemetery for its intended use on the day of the ceremony.

The forum's "intended use," moreover, is not merely the use the government claims but the uses shown by the "facility's actual operation," *Multimedia*, 991 F. 2d at 162-163. From 1998 through 2001, the Cemetery during the Confederate memorial ceremony was a forum for speeches highly critical of the VA's restrictions on display of the Confederate flag. (Buck Decl. ¶ 3.) Speech critical of VA policies thus is an "actual use" of the day of the ceremony. Mr. Griffin and Fr. Anderson have previously given speeches at the ceremony that include views critical of VA flag policy and private groups, along with Fr. Anderson's commentary. (*Id.* Exhs. 1, 2.) Further speech of this kind at the 2003 ceremony thus is consistent with the forum's actual use.

2.    **There is No Evidence that the Forms of Speech the VA Forbids Lead to "Disruption" of, or Improper Conduct in, the Cemetery.**

The VA claims that speech such as Mr. Griffin's intended remarks and Fr. Anderson's speech is "not in keeping with maintaining the cemetery as a national shrine" as provided in § 2403(c). (R. Rapp letter August 5, 2002, Couch Decl. ¶ 4, Exh. 2.) Whatever the "intended use" of the forum may be, to sustain its speech restrictions, the VA must "prove the links in its chain of reasoning," *UFCW*, 163 F. 3d at 357-358, between the exclusion of speech and preservation of the forum for its intended use. To meet this burden, the VA must demonstrate more than a speculative possibility of interference with the intended use. *Tinker*, 393 U.S. at 508; *Sypniewski v. Warren Hills Reg. Board of Educ.*, 307 F. 3d 243, 253 (3rd Cir. 2002);

-30-

*Sammartano v. First Judicial Court, Etc.*, 303 F. 3d 959, 969-970 (9th Cir. 2002). Speech, moreover, is not banned simply because it does not advance the purpose of the forum. *Jews for Jesus*, 482 U.S. at 576; *Multimedia*, 991 F. 2d at 162 (government is not "free to ban all speech not directly advancing the forum's intended purpose".) The government must show that the speech "might actually interfere" with that purpose. *Id.* at 159.

There is absolutely no evidence that speech such as Mr. Griffin's or Fr. Anderson's will incite anyone to lawless or violent conduct, or to any acts that might injure the Cemetery. There is no evidence that their remarks will lead to any acts not fully in keeping with maintenance of the Cemetery as a shrine. Indeed, the evidence (Griffin Supp. Decl. ¶ 22; Buck Decl. ¶ 9) is uncontradicted that no such disturbance has ever occurred in connection with such remarks. All that will happen if Mr. Griffin gives his intended 2003 speech (Griffin Supp. Decl. ¶ 13, Exh. 9) is that he will say certain words in a quiet, dignified manner in front of an attentive and respectful audience. That is hardly conduct that threatens the atmosphere of the Cemetery.

Inability to adduce evidence of a credible threat of disruption has consistently proven fatal to speech restrictions even in schools and courthouses, which are especially sensitive to disruption. In *Tinker*, 303 U.S. at 508, the Court held unconstitutional a prohibition on black armbands worn to protest the Vietnam war. The Court emphasized: "There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." *Id.* Further:

> In order for the State in the person of school officials to justify prohibition of a
> particular expression of opinion, it must be able to show that its action was caused
> by something more than a mere desire to avoid the discomfort and unpleasantness

-31-

that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. *Id.* at 509.

In *Sypniewski*, 307 F. 3d at 254-255, 257-258, the Third Circuit held that a student's suspension for wearing a "redneck" t-shirt at a school that had been plagued by incidents of racial hostility violated the First Amendment. The court reasoned that the evidence failed to support school officials' asserted fears that the plaintiff's particular shirt was likely to cause disruption, although the court found the "redneck" theme of the shirt associated with symbols that had caused disruption, including the Confederate flag. Such a "general association," however, was not enough. School officials, the court reasoned, must be able to "point to a particular and concrete basis for concluding that the association [between the T-shirt and prior disruptions] is strong enough to give rise to well- founded fear of genuine disruption in the form of substantially interfering with school operations or with the rights of others." *Id.* at 257.

In *Cohen v. California*, 403 U.S. 15, 23, 91 S. Ct. 1780, 1787 (1971), the Court rejected the state's argument that defendant's wearing a "Fuck the Draft" jacket in a state courthouse was likely to cause disturbance. "We have been shown no evidence," the Court reasoned, "that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities" with such speech."

In *Sammartano*, 303 F. 3d at 968, a judicial district sought to justify a ban on "biker" clothing (including a jacket that bore an American flag and the words "Try to burn this, asshole," *id.* at 963) from a state courthouse on the grounds that biker symbols might be disruptive and

intimidating to persons seeking to use the courthouse. In rejecting this contention the court emphasized a lack of evidence "supporting a conclusion that clothing indicating affiliation with biker organizations is particularly likely to be disruptive or intimidating." In this case, there is absolutely no evidence that speeches such as Mr. Griffin's intended 2002 and 2003 remarks and Fr. Anderson's speech at the 2002 ceremony will cause disruption at the Cemetery. Such remarks have been made repeatedly in past years and have led to *no disturbances whatsoever*. As in *Tinker, Sypniewski, Cohen and Sammartano*, the VA's justification for prohibiting Plaintiffs' speech on the grounds that it will disrupt the decorum, tranquility or shrine atmosphere of the Cemetery fails for a complete lack of supporting evidence.

**3.    The VA Erroneously Views the Expression of Disfavored Viewpoints as "Disruption."**

The VA's objections to Mr. Griffin's and Fr. Anderson's speech under § 1.218(a)(14) and § 2403(c) are not based on the use of foul language. ("Hogwash!" in Mr. Griffin's proposed 2002 remarks (Griffin Supp. Decl. ¶ 10, Exh. 1) is about as rough as the language has gotten.) *Cf. Cohen, Sammartano.* They are not based on any improper behavior, or even a colorable threat of misconduct. *Cf. Tinker, Sypniewski.* The VA objects to Mr. Griffin's and Fr. Anderson's speech on the grounds that the *ideas* expressed for some reason are inherently disruptive, *i.e.* that those *ideas* (*e.g.* opposition to VA flag policy) lack "decorum" and threaten "tranquility" and are "not in keeping with . . . a shrine" even if stated in normal tones, without foul language and without causing any improper conduct. The VA's application of its restrictions thus goes well beyond the statute held unconstitutional in *Cohen*. In that case defendant was arrested for his use of an especially foul four-letter word. If Mr. Cohen had instead worn a jacket that read,

-33-

"Abolish the Draft!" or "Let's Have a Volunteer Army!!" he would not have been prosecuted. Mr. Griffin has not said, "F--- the VA's flag policy." For politely saying that the VA's flag policy is wrong and should be changed (*see* Griffin Supp. Decl. ¶ 13, Exh. 9.), he faces criminal prosecution.

The VA's attempt to regulate the "offensiveness" of ideas (or in the VA's terms their purported lack of "decorum," threat to "tranquility" and a "shrine" atmosphere). In connection with the offensiveness of expression, the *Cohen* Court reasoned that "one man's vulgarity is another's lyric . . . [I]t is largely because governmental officials *cannot make principled decisions in this area* that the Constitution leaves matters of taste and style . . . to the individual." *Id.*, 403 U.S. at 25. (Emphasis added.)

In *Sammartano,* the Ninth Circuit applied *Cohen* in the context of a courthouse and reasoned: "Most significantly, *Cohen* stands for the proposition that even in light of the purposes of the forum, it is not reasonable to prohibit speech in courthouse hallways merely because it may offend some people's sense of decorum." *Id.* 303 F. 3d at 969. Just as court authorities could not prohibit biker symbols on the grounds that such expression inherently lacks "decorum," the VA cannot prohibit calls for, *e.g.*, daily display of the Confederate flag, because that idea purportedly lacks decorum.

**E.**    **The Prohibition on Speech "Attempting to Influence" Unreasonably Subjects Speakers to the Inferences Officials May Draw as to their "Intent."**

The "partisan activities" prohibition also bans speech "attempting to influence" current policy of the federal government or a private group. "Attempt" means a conscious effort. How does one determine whether a speaker is "attempting to influence" speech? If a speaker

describes, for example, the effects of the VA's 363-day policy limiting display of the Confederate flag, is he "attempting to influence" such policy? The key question is not the speaker's words themselves, but what he *intends* by them. In *Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315 (1945), the Supreme Court held that such a law is unconstitutional. The defendant in *Thomas* was convicted for violating an injunction based on a state statute that required labor organizers to register with the state before "soliciting" workers to join a union. The Court held the prohibition on solicitation unconstitutional because the organizer could not discuss the benefits of union membership without implicitly "soliciting" workers in the audience to join. The Court reasoned:

> No speaker, in such circumstances, safely could assume that anything he might say upon the general subject [*i.e.* benefits of union membership] would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. *Id.*

The "attempting to influence" prohibition suffers from the same defect. It places a speaker "wholly at the mercy" of what a VA official may infer about the speaker's intent from his speech. For example, if Mr. Griffin notes the beauty of the Confederate flag above the Confederate mass grave (Griffin Supp. Decl. Exh. 9), is he implicitly seeking to "influence" the VA to continue allowing the flag to fly? If he criticizes hate groups that abuse the Confederate flag, are his remarks an attempt to influence their policy toward the flag? No speaker could feel safe from the inferences his hearers might draw about whether he is "seeking to influence" current federal policy or that of a private group.

-35-

The prohibition also suggests that other speech or conduct of the speaker might also prove relevant to whether he is "attempting" to influence speech. The result is likely to discourage expression outside the Cemetery, lest such speech be used as grounds for inferring the "wrong" intent behind words spoken at the Cemetery. *See Perry v. Bartlett,* 231 F.3d 155,161 (4th Cir.2000). Under *Thomas,* the "attempting to influence" prohibition violates the First Amendment. For VA officials to decide which speech is an attempt to influence federal or private policy also involves their drawing vague, subjective and unconstitutional distinctions about which speech "attempts" to influence policy and which does not. *Jews for Jesus, Inc.,* 482 U.S. at 576.

**F.     The "Orations" Prohibition is an Unreasonable Prior Restraint on All Speech Among "Groups" of People at the Cemetery.**

Section 1.218(a)(14)(ii) prohibits "orations or similar conduct to assembled groups of people, unless the oration is art of an authorized service . . . ." Speech among groups, however, can only be "authorized" if it has been approved *earlier.* The "orations" prohibition thus is a "prior restraint" because it gives "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1244 (1975). Such a blanket prior restraint on all speech among even small, informal groups is unreasonable.

Informal groups constantly "assemble," disband and reassemble at Point Lookout in connection with the Confederate memorial ceremony.[6] Small groups also "assemble"

---

[6] The VA has stated that it will not prosecute informal group discussions conducted at the Confederate memorial ceremony. (VA Opp. to TRO, June 5, 2002, at 9.)

spontaneously on other, informal visits to the Cemetery. (Griffin Supp. Decl. ¶ 5; Buck Decl ¶ ¶ 5, 7.) A "group"[7] can be as few as two or three individuals "assembled" for casual discussion, *i.e.* conduct "similar" to an "oration." These discussions cannot possibly be "approved" by the VA in advance because the participants do not know in advance what they will be saying. (Griffin Supp. Decl. ¶ 6.)

An unauthorized "oration or similar conduct" may consist of nothing more than casual conversation ("Hello, how are you?" "I drove for four hours to get here today.") or the recitation of a prayer ("I know that my Redeemer liveth") or historical commentary ("My ancestor was imprisoned here after Gettysburg."). (Griffin Supp. Decl. ¶¶ 5, 8; Buck Decl. ¶ 7 .) Regardless of how innocuous the speech may be, participants in such small-group discussions face imprisonment unless they receive advance permission for their "service" from the VA. But to seek such permission, the group would have to know what the members intend to say in advance. Given the spontaneous nature of small-group visits to the Cemetery (Griffin Supp. Decl. ¶ 6; Buck Decl. ¶ 7), it is not possible to know in advance what will be said. Thus it is impossible to clear the discussion with the VA in advance. Further, even if a group knew exactly what would be said, they would have to submit their request to hold a "service" at the Cemetery 30 days in advance. (*See* K. Stoner letter to F. Willis, Wright Decl. Exh. 2.)

To sustain the "orations" restriction, the VA bears the burden of demonstrating that a spontaneous group discussion unaccompanied by any improper conduct "might actually interfere" with the purpose of the Cemetery. *Multimedia Publishing*, 991 F.2d at 159; *UFCW*,

---

[7] Webster's Third International defines "group" in part as "a relatively small number of individuals assembled or standing together."

163 F.3d at 358. The VA cannot sustain this burden. The purpose of the Cemetery is to honor the Confederate dead. As the Fourth Circuit held in *Griffin I*, 363 days a year, the Cemetery is dedicated to honoring the Confederates "as Americans." On Memorial Day and the day of the Confederate memorial ceremony, it is dedicated to honoring the Confederates "as Confederates." *Id.*, 274 F. 3d at 821-822. To permit small groups spontaneously to enter the Cemetery and talk among themselves, without engaging in any destructive or other improper conduct, does not threaten the intended use of the forum.

A much narrower restriction on speech that is unnecessarily loud, obscene or accompanied by conduct injurious to persons or property is all that the VA requires to preserve the tranquility of Point Lookout. The VA can regulate speech at the Cemetery without silencing all groups that are unable to obtain 30 days' advance permission from the VA. The "orations" prohibition is grossly unreasonable as applied to Plaintiffs' small-group speech at the Cemetery.

## VI.

## THE VA's UNWRITTEN RESTRICTIONS VIOLATE 39 U.S.C. § 901
## AND THE FIRST AMENDMENT

In its June 5, 2002 letter, the VA warned that the inclusion of "political statements that are, in the view of the National Cemetery Administration, inconsistent with maintaining the decorum of the cemetery," could result in cancellation of the ceremony. The VA later threatened to impose a criminal fine on Mr. Griffin unless he amended his remarks to remove these references. In his August, 2002 letter, Mr. Rapp objected to Fr. Anderson's "personal views . . . critical of a number of individuals and organizations"and "commentary on current events . . ." One can view these restrictions in at least two ways: As independent prohibitions,

-38-

which they appear to be, or as evidence that the VA's imprecise attempt to apply the "partisan activities" prohibition.

Considered independently, the restrictions violate 39 U.S. Code, § 901(a)(1), which requires the Secretary of the VA to "prescribe regulations for the maintenance of law and order and the protection of person and property on Department property."[8]  Subsection (d) requires that the rules, and the penalties for their violation, "be posted conspicuously on the property to which they apply."  Far from meeting these requirements, the VA has not even reduced the above prohibitions to writing. Certainly they are not included in § 1.218(a)(14).  The prohibitions therefore violate § 901 and are void.

With respect to all three prohibitions, the VA must show that prohibition of such speech is reasonably necessary to preserve the forum for its intended use. *Lee*, 505 U.S. at 687; *Multimedia*, 991 F. 2d at 162.  To preserve the Cemetery as a forum for honoring the Confederate dead, it is not necessary to prohibit such "political" remarks as an endorsement of the Confederate cause, criticisms of persons or organizations who seek to banish the Confederate flag from public display or discussion of current events.  The prohibition on "commentary on current events" would prohibit virtually all references to contemporary life. The restrictions therefore are unreasonable.

A prohibition on "political" statements is overbroad and vague.  Virtually anything one says about the Civil War, including the treatment of Confederate prisoners, can be viewed as "political."  The prohibition is viewpoint-based. *See Rosenberger*, 515 U.S. at 831-832

---

[8] To the extent the Secretary must comply with the Administrative Procedure Act, 5 U.S.C. § 706, the unwritten prohibitions clearly are invalid.

(describing a political approach to a subject as a "viewpoint"). The line between "political" and

"non-political" speech also is so murky and subjective as to confer on VA officials an

unrestrained and unconstitutional power to arrest speakers. *See Jews for Jesus*, 482 U.S. at 576

(distinction between airport-related and non-airport-related speech unconstitutionally vague).

The prohibition on "personal views . . . critical of individuals and organizations" suffers

from similar defects. A "view" critical of a person or organization describes a viewpoint.

Certainly the line between "criticisms" of people or organizations would appear just as murky as

that in *Jews for Jesus*. The VA's newly minted, unwritten prohibitions therefore are void.

The unwritten prohibitions can also be viewed as evidence of the VA's inability to apply

the "partisan activities" prohibition as written. Instead of identifying the speech that clearly fits

within the prohibition's forbidden categories, the VA lapses into descriptions of "political"

remarks and "commentary on current events."

## VII.

## THE VA'S CENSORSHIP POLICY VIOLATES 39 U.S.C. § 901

## AND THE FIRST AMENDMENT

In defendant Rapp's letter of August 9, 2002 to Mr. Couch (Couch Decl. Exh. 1), the VA

requires that the sponsor of the Confederate memorial service submit intended remarks in

advance for censorship by the VA. The VA repeats this demand in its March 21, 2003 letter to

Mr. Willis (Wright Decl. Exh. 2.) Plaintiffs have not been able to find a written regulation that

embodies the censorship requirement. Unless it is embodied in a written rule of some kind, and

posted at the Cemetery, it violates 39 U.S.C. § 901.

Even if it was properly promulgated by the VA, the requirement violates the First Amendment. The requirement is patently viewpoint-based, as shown above in the discussion of the "partisan activities" prohibition and the VA's objections to some of the viewpoints Mr. Griffin and Fr. Anderson expressed, but not others. A standardless censorship scheme violates the First Amendment because it *may* result in viewpoint-based censorship. *City of Lakewood v. Plain Dealer Pub. Co.* 486 U.S. 750, 763-764, 108 S.Ct. 2138, 2147 (1988). The VA's censorship requirement here is explicitly based on the viewpoint-discriminatory "partisan activities" prohibition and the VA's unwritten prohibition on political and other disfavored remarks. Viewpoint discrimination under the VA's scheme thus is *certain*. Such a scheme violates the First Amendment and cannot be applied to Plaintiffs.

## VIII.

## THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS
## FAVOR ISSUANCE OF THE INJUNCTION

The United States Constitution "generally favors more speech." *Rappa v. New Castle County*, 18 F.3d 1048, 1073 (3rd Cir. 1994). The public interest favors free and open discussion among willing participants. The requested injunction will allow Mr. Griffin, members of the SCV and the PLPOW to engage in and hear speech without having to choose between self-censorship and criminal sanctions. The requested injunction would also permit those who wish to *hear* the forms of speech that take place at the Confederate memorial service to do so in peace. *Virginia v. American Booksellers' Assn., Inc.*, 484 U.S. 383, 392-393 (1988) (booksellers permitted to assert rights of bookbuyers to purchase regulated books).

In an effort to show some semblance of public interest in the VA's suppression of speech, Defendants argue that Plaintiffs' speech is "unsuited to the forum at issue." But as shown above, the VA silences as "partisan activities"only that speech which *expresses a disfavored viewpoint*. The "orations" prohibition applies to any speech among a group of people whatsoever -- including a graveside prayer. Unless one assumes that all speech by small groups of people is "unsuited to the forum," the VA's argument completely fails as to that prohibition. The public has no interest in viewpoint discrimination or a blanket prohibition on speech among members of a group. The public interest clearly favors issuance of the injunction.

If the injunction issues, the VA will suffer no harm. At most, speech like that which has occurred at the Cemetery since 1998 will take place at the 2003 memorial ceremony. The evidence is uncontradicted that no such speech, including speech opposing the VA's flag policy, has ever resulted in any harm to the Cemetery or to any person. The VA will not be harmed by the expression of viewpoints VA officials dislike.

The VA purports to worry that if it allows Mr. Griffin's speech (or presumably other speech prohibited as "partisan activities") it will have to "open up its cemeteries to partisan political speech." But in connection with the Confederate memorial ceremony, the VA opens the Cemetery to the Confederate flag which, -- *according to the VA* -- is an immensely inflammatory, disruptive and contentious symbol, almost on a par with a burning cross. The VA cannot do this and then complain that it faces the prospect of "partisan speech" in the Cemetery. Moreover, § 1.218(a)(14)(ii) already permits a wide variety of contentious speech -- just as long as it is directed at certain targets, *e.g.* state and local government, and not the current policy of

-42-

the federal government. It defies reason for *all forms* of criticism to be suppressed at the

Cemetery. Otherwise, the VA might be free to arrest Fr. Anderson for criticizing Reconstruction.

By contrast, if the injunction does not issue, Plaintiffs will suffer real and irreparable

injury. They will lose their First Amendment rights. "The loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427

U.S. 347, 373-374, 96 S.Ct. 2673, 2690 (1976). They will remain in fear throughout the PLPOW

pilgrimage of being arrested by VA "speech police." Some may actually be prosecuted.

## IX.

## CONCLUSION

For the reasons set forth above, the Court should issue a preliminary injunction,

prohibiting Defendants from enforcing the "partisan activities" and "orations" prohibitions of 38

C.F.R. § 1.218(a)(14) at the Cemetery, in connection with the June 14, 2003 memorial ceremony

or otherwise, pending the issuance of final judgment in this action.


Dated: April __, 2003                    Respectfully submitted,

GREBER & BURGOON                         CASE, KNOWLSON, JORDAN & WRIGHT

By:_____/s/_____           By: _____/s/_____
  Stephen S. Burgoon                        Michael F. Wright (*pro haec vice*)
  (U.S. Bar No. 22207)                      (U.S Bar ID No. 82536)
  8 East 2nd Street, Suite 203              2049 Century Park East, Suite 3350
  Frederick, Maryland 21701                 Los Angeles, California 90067
  Phone: (301) 696-9636                     Phone: (310) 552-2766
  Fax: (301) 696-9637                       Fax: (310) 552-3229
                                            e-mail:mwright@ckjw.com


                                            Lookout Prisoner of War Association