UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Patrick J. Griffin, III, an individual,<br>14101 Berryville Road<br>Darnestown, Maryland 20874-3517<br><br>Sons of Confederate Veterans, a Mississippi<br>non-profit corporation,<br>R.G. Wilson, Commander-in-Chief,<br>740 Mooresville Pike<br>Columbia, TN 38401<br><br>Point Lookout Prisoner of War Assn.,<br>A nonprofit unincorporated association,<br>Patricia B. Buck, President,<br>1214 Moyer Road<br>Newport News, VA 23608-2453<br><br>      Plaintiffs,<br><br> vs.<br><br>Department of Veterans Affairs,<br>a Department of the United States Government<br>810 Vermont Avenue, NW<br>Washington, D.C. 20420-0001<br><br>Roger R. Rapp, Director, National Cemetery<br>System, a Division of the Department of Veterans<br>Affairs, an individual, in his official capacity,<br>810 Vermont Avenue, NW<br>Washington, D.C. 20420-0001<br><br>Ken Stoner, Director, Point Lookout Confederate<br>Cemetery, an individual, in her official capacity,<br>5501 Frederick Avenue<br>Baltimore, Maryland 21228,<br><br>      Defendants. | Civil Action No. WMN-02-1917<br><br>SUPPLEMENTAL DECLARATION<br>OF PATRICK J. GRIFFIN, III IN<br>SUPPORT OF PLAINTIFFS' MOTION<br>FOR PRELIMINARY INJUNCTION |

**********************************************************************

I, PATRICK J. GRIFFIN, III, declare and say as follows:

1. I am a plaintiff in this action. I submit this declaration in support of plaintiffs' motion for preliminary injunction. I know the matters stated herein of my own personal knowledge and if called as a witness could and would testify competently thereto. I am a life member of the Sons of Confederate Veterans ("SCV") and also belong to the Point Lookout Prisoner of War Association ("PLPOW"), both of which are plaintiffs in this action. I am a past Commander-In-Chief of the SCV, an organization of over 36,000 members worldwide, dedicated to preserving the history and memory of the Confederate soldier.

2. I have brought this action to enforce my constitutional right to engage in and hear forms of verbal speech at Point Lookout Confederate Cemetery ("the Cemetery"), without fear of arrest and criminal prosecution by the United States Department of Veterans Affairs ("VA"). In addition to delivering addresses as part of the Confederate memorial ceremony held at the Cemetery each June, I engage in speech on visits to the Cemetery and other VA-controlled cemeteries on an ongoing basis as set forth in greater detail below.

3. For the past thirty-five years I have visited many cemeteries to pay respect to my ancestors who served the United States of America and the Confederate States of America, to mark graves, locate soldiers' graves, identify soldiers' graves, and record tombstone information. The following list represents some of the national cemeteries, private cemeteries, or cemeteries under control of the VA that I have visited in the past, and in which I have made casual remarks or speeches to individuals or groups. The name of the cemetery is followed by its location in parentheses. The abbreviation "NC" refers to a national cemetery:

| | | |
|---|---|---|
| Alabama | - | Mobile NC, Elmwood (Birmingham), Live Oak (Selma), Bankhead (Mentone), Fairhaven Baptist (Gadsden) |
| Arkansas | - | Fayetteville NC |
| District of Columbia | - | Battleground NC, Congressional Cemetery, Oak Hill, Mt. Olivet, Soldiers Home NC |
| Florida | - | Barrancas NC, City Cemetery (Key West) |
| Georgia | - | Marietta NC, Macedonia Church (Chattooga Co.), Andersonville NC |
| Illinois | - | Westwood (Shawneetown) |
| Indiana | - | Alton (Coburn's Corner) |
| Louisiana | - | Baton Rouge NC |
| Maryland | - | Baltimore NC, Loudon Park NC, Point Lookout Confederate Cemetery, Antietam NC, St. Ignatius (Urbana), Greenmount (Baltimore), St. Paul's (Baltimore), Gen. Jeremiah Crabb (Gaithersburg) Frostburg Memorial Park (Frostburg), St. Anne's (Annapolis), Cool Springs (Charlotte Hall), All Saints' Episcopal (Reisterstown), Grace Episcopal (Silver Spring), Loudon Park private (Baltimore), St. Rose (Gaithersburg), Monocacy (Beallsville), Parklawn (Rockville), Darnestown (Darnestown), Darnestown Presbyterian (Darnestown), Pleasant Hills (Darnestown), Washington Confederate (Hagerstown), Salem Church (Brookeville) |

| | | |
|---|---|---|
| Mississippi | - | Biloxi NC, Vicksburg NC, Beauvoir (Biloxi) |
| Missouri | - | Jefferson Barracks NC, Springfield NC, Bellfontaine (St. Loius) |
| New Jersey | - | Finns Point NC |
| New York | - | Cypress Hill NC, Long Island NC, Woodlawn NC, USMA (West Point), Woodlawn (Bronx), Holy Cross (Brooklyn), Pine Hill (Auburn) |
| North Carolina | - | Wilmington NC |
| Ohio | - | Fairview (Galion) |
| Pennsylvania | - | Philadelphia NC, Laurel Hill (Philadelphia), Gettysburg NC |
| South Carolina | - | Florence NC, St. Lawrence (Charleston), Magnolia (Charleston), Elmwood (Columbia), Four Hole Baptist Church (Orangeburg) |
| Tennessee | - | Chattanooga NC, Nashville NC, Shiloh NC, McGavcock (Franklin), Columbia (Columbia), Elm Springs (Columbia), Stones River NC |
| Texas | - | San Antonio NC, Ft. Sam Houston NC |
| Virginia | - | Alexandria NC, Balls Bluff NC, Quantico NC, Richmond NC, Winchester NC, Oakwood (Richmond), Old Blanford (Petersburg), Hollywood (Richmond), Alington NC, Grace Church (Yorktown), Leesburg Presbyterian (Leesburg), Stonewall Cemetery (Winchester), Stonewall Jackson grave (Lexington), Christ Church (Alexandria), Fredericksburg NC, Yorktown NC |
| West Virginia | - | Elmwood (Shepherdstown), private family (Hardy Co.) |

It is my understanding that all of the national cemeteries listed above are owned and controlled by the United States government, and in most cases by the VA. I estimate that I have visited twenty (20) VA cemeteries on a total of at least fifty-five (55) occasions, on each of which I have engaged in one or more of the forms of verbal expression described in this declaration. I have engaged in similar expression on visits to two (2) U.S. Army cemeteries (15 visits to Arlington and 1 to Old Soldiers') and ten (10) National Park Service cemeteries (23 visits). I intend to continue to make such visits and to speak my mind in the future as I have in the past.

   4.  At cemeteries where Confederate soldiers are interred one can honor the Confederate dead in the immediate proximity of those dead. The emotional significance of a private or public expression of remembrance for the Confederate dead is immensely enhanced when one stands among the graves of Confederate soldiers. Cemeteries therefore are natural gathering-places of those who wish to honor the memory of Confederate soldiers. I participate in such remembrances, both formal and informal, to honor the memory of my Confederate ancestors and all Confederate soldiers and to honor their service to the Confederacy. I believe that the Confederate soldier exemplified the virtues of courage, devotion to duty and self-sacrifice in the defense of one's homeland. I believe the Confederate soldier and the Southern people fought the War for Southern Independence for the right to govern themselves and not to have a government imposed on them by force. In my opinion, this principle was worthy in 1861 and remains so today. I have expressed these sentiments to individuals and groups on virtually every visit I have ever made to a national cemetery. I have every intention of continuing this practice as long as I can.

   5.  In connection with my visits to the Cemetery and other cemeteries as described

above, I have engaged in extensive private conversations, without prior VA approval, with small groups of friends and associates. While in VA cemeteries I have frequently discussed VA policies restricting the display of Confederate flags; the condition of Confederate monuments at VA sites; the condition of individual Confederate graves at VA sites; the whereabouts and condition of possible mass burial locations of Confederate remains on VA sites; federal court decisions pertaining to Confederate flags and other speech honoring Confederate soldiers who are buried in VA cemeteries; and the overall condition of VA cemeteries and physical improvements at those sites. My discussions have included criticism of the VA with respect to the above subjects. In connection with my visits to VA cemeteries, I also listen to the speech of other group members, which often addresses the same issues that I address myself.

6. I have no intention of obtaining prior VA approval for such conversations. I could not do so with respect to informal remarks, because I do not know in advance what I or other group members will say.

7. It was brought to my attention during recent litigation that my conversation with groups of associates and friends in VA cemeteries may violate VA policy and expose them and me to criminal sanctions. I intend to continue, as I have in the past, to honor my Confederate ancestors and all Confederate soldiers whose remains lie in VA national cemeteries through the kind of discourse described above. I am concerned, however, that my speech or that of others with whom I speak may result in my being arrested, criminally prosecuted, fined and possibly even imprisoned. I am also concerned that others with whom I engage in informal, small-group discussions may be subjected to the same treatment.

8. For many years I have attended ceremonies in VA-owned cemeteries in honor of

Confederate soldiers. At these ceremonies I am often requested to deliver a speech. In my addresses to small groups of listeners I frequently offer a prayer or poem in tribute to the memory of Confederate veterans. I also provide historical commentary in which I discuss the Confederate cause, the character of Confederate soldiers and the relevance of this history to contemporary life. I sometimes express criticism of the VA for caring or failing to care for soldiers' graves and cemeteries. I also express praise for government entities and private groups who honor the Confederate dead and show respect for the Confederate flag. These remarks are one way in which I seek to honor the memory of the Confederate soldier by speaking in favor of those who show honor to the Confederate soldier and against those like the VA who in my opinion dishonor him. My intention is to continue to deliver such addresses in VA-owned cemeteries.

9. On several occasions, I have delivered a speech at the annual Confederate memorial ceremony held each June at the Cemetery. In June, 2001 and June, 2002 I delivered such a speech. As the June 8, 2002 ceremony approached, I became concerned about whether the VA would enforce its speech regulations against me for delivering a speech, as I had done in 2001, critical of VA policies. At that time I was involved in two petitions for Supreme Court review of appellate decisions in which federal appellate courts upheld VA regulations concerning display of Confederate flags at VA cemeteries. I was concerned that the VA might now try to silence my verbal speech by arresting and/or trying to impose criminal penalties against me.

10. On or about May 24, 2002, my attorney sent a letter to the VA, to which a copy of my intended remarks was attached. A true and correct copy of my intended 2002 speech is attached hereto as Exhibit 1. My attorney informed the VA of my intended remarks and asked, among other things, that I be allowed to deliver the speech. A true and correct copy of my

attorney's letter, which I saw at the time it was sent, is attached hereto as Exhibit 2. On or about June 6, 2002, I saw what I understood to be the VA's responses to my attorney's letter and my proposed speech. The Captain Vincent J. Camalier Camp No. 1359, Sons of Confederate Veterans ("Camalier Camp") sponsors the ceremony. Mr. J.B. Couch, the camp commander in mid-2002, forwarded to me a letter that he had received from the VA, dated June 5, 2002. A true and correct copy of this letter is attached hereto as Exhibit 3. My attorney forwarded to me a copy of the VA's response to his May 24, 2002 letter, a true and correct copy of which is attached hereto as Exhibit 4. From these letters and from verbal communications by the VA to my attorney, which were relayed to me, I understood that the VA would attempt to fine me if I delivered my intended speech. I also understood from the letter to Mr. Couch that the VA might not permit future Confederate memorial ceremonies if I delivered the speech. In view of the VA's position, I applied for a temporary restraining order ("TRO") in this Court on June 7, 2002. The application was denied by this Court, The Hon. Andre Davis presiding. In the absence of the TRO, and to avoid criminal prosecution and prohibition of future ceremonies, I reluctantly revised my remarks. A true and correct copy of my revised remarks is attached hereto as Exhibit 5.

11.     At the June 8, 2002 ceremony, Fr. Alister C. Anderson gave a speech. I was personally present for the entire address and also observed the crowd reaction. A true and correct copy of the text of the speech is attached hereto as Exhibit 6. While I cannot recall the entire speech, I recall it sufficiently to identify the text as an accurate reflection of Fr. Anderson's remarks. The audience reaction to Fr. Anderson's speech was enthusiastic. It included sustained applause and cheers. At no time, however, did anyone present engage in any conduct that appeared in any way likely to be injurious to persons or property. The audience was at all times

attentive and respectful.

12. In or about early August, 2002, Mr. Couch forwarded to me a letter he had received from the VA's Roger Rapp. A true and correct copy of this letter is attached hereto as Exhibit 7. In the letter, Mr. Rapp complained about certain views Fr. Anderson expressed in his speech and threatened to withhold permission for the June, 2003 ceremony unless the VA receives "assurances" that remarks like Fr. Anderson's will not be repeated. Mr. Rapp also stated that a "summary of the intended remarks of any speakers" intended for the ceremony must be submitted in advance for review by the VA. Attached hereto as Exhibit 8 is a true and correct copy of a letter dated March 23, 2003 I received from the Camalier Camp concerning my speech.

13. A Confederate memorial ceremony at the Cemetery is planned for June 14, 2003. I intend to deliver a speech at the ceremony, a true and correct copy of which is attached hereto as Exhibit 9. I would like to include in my remarks reference to Judge Timothy Dyk's characterization of 38 C.F.R. § 1.218(a)(14), on which the VA's flag and speech restrictions are based, as so "grossly overbroad" that it "reads like a law school examination in which law students are invited to find the maximum number of serious constitutional issues raised by a hypothetical ordinance." *Griffin v. Secretary of Veterans Affairs*, 288 F.3d 1309, 1331 (Fed. Cir.) *cert. denied* 120 S.Ct. 410 (2002). I would like to ask my audience rhetorically if something so "grossly overbroad" in Judge Dyk's phrase can possibly be law in America and if it is, whether something is seriously wrong. I also would like to criticize the opinion of the Fourth Circuit Court of Appeals in *Griffin v. Dept. of Veterans Affairs*, 274 F.3d 818 (4th Cir. 2001), *cert. denied*, 120 S.Ct. 410 (2002). I believe the VA's restrictions on verbal speech and display of the Confederate flag and the Fourth Circuit's decision upholding those restrictions stigmatize the

-8-

flags that symbolize Confederate soldiers' patriotism, devotion to duty, honor and courage, thereby dishonoring both the Confederate soldier himself and the cause of self-government for which I believe Confederate soldiers fought. I believe, and would like to say in my remarks, that the Fourth Circuit's opinion is a perversion of law and justice. I believe and would like to say that in my opinion one of the Fourth Circuit judges engaged in an activist, result-oriented jurisprudence driven by his personal opposition to what he erroneously perceives the flag to symbolize. I believe this type of judicial conduct is extremely dangerous and contrary to the Confederate soldier's respect for the Constitution and the rule of law. I believe, would like to say, that the other two judges on the Fourth Circuit panel ruled in favor of the VA because they seek Supreme Court appointments but are perceived as arch-conservatives. I would to say that these judges ruled against display of the Confederate flag to "build a record" in preparation for their hoped-for examination by the Senate Judiciary Committee. I would like to contrast such self-seeking with the conduct of Robert E. Lee, who in April, 1861, was offered command of the armies of the United States but refused it on grounds of principle. I have not included some of these comments in my proposed remarks to avoid VA reprisals.

14. In my opinion, the Fourth Circuit's decision is part of a wider cultural war against the Confederate soldier's true history, as symbolized by his flag -- a soldier's flag under which Confederate soldiers fought magnificently and valiantly for worthy principles. I would like to contrast in my remarks the shameful conduct of the VA and the Fourth Circuit with the attitude of the state of Rhode Island and private groups in that state. The state itself and private groups in Rhode Island recently held a memorial ceremony in honor of Confederate veteran Samuel Postlewaite, who is buried in Rhode Island. Both the state government of Rhode Island and

private groups in that state exhibited the kind of respectful attitude that is needed in contemporary American society.

15.    An important tradition in honoring the Confederate dead is that of defending the position of the Confederate soldier and the cause for which he fought in contemporary life. In 1864, Major-General Patrick R. Cleburne warned that if the Confederacy lost the War, its history would be misrepresented. If defeated, the South could expect that "the history of this historic struggle will be written by the enemy; that our youth will be trained by Northern school teachers; will learn from Northern schools books their version of the war; will be impressed by all the influences of history and education to regard our gallant dead as traitors, our maimed veterans as fit objects for derision...." General Cleburne went on in his letter to repudiate the notion that the Confederate soldier was fighting for slavery and to call for the emancipation of slaves in the Confederacy. In his "Charge to the Sons of Confederate Veterans," written in 1906, Lieutenant-General Stephen Dill Lee wrote:

> To you, Sons of Confederate Veterans, we submit the vindication of the Cause for which we fought; to your strength will be given the defense of the Confederate soldier's good name, the guardianship of his history, the emulation of his virtues, the perpetuation of those principles he loved and which made him glorious and which you also cherish. Remember, it is your duty to see that the true history of the South is presented to future generations.

Numerous other wartime and post-war examples could be cited to show the great concern of Confederate veterans that they and their cause be remembered for what they really were.

16.    I take the Cleburne-Lee admonition seriously. To me, Confederate history does not

live only in museums. It is not simply a matter of saying that everything is rosy -- especially when it is not. I believe that it honors the Confederate dead to speak out against governmental and private attempts to dishonor the Confederate soldier, his flag and his cause. For example, I believe the VA's restrictions on display of Confederate flags are based on the notion that the flag stands for something that cannot be freely, openly and consistently expressed, even at an all-Confederate cemetery. The assumption underlying the VA's restrictions is that "there is something wrong" with the Confederate flag and it therefore may only be brought out twice a year for display over the graves of Confederate soldiers. In my opinion, it should fly over those graves every day. The Confederate flag is not just a piece of cloth. In the war, battle flags were important rallying points for soldiers. They were regimental symbols, cultural expressions and guide in battle. To fly a soldier's flag over a soldier's grave is not only a time-honored practice but a uniquely powerful and poignant way of saying that the soldier is physically dead but his memory and the cause he fought for live on. Policies such as the VA's, which assume that the Confederate flag is deserving of less display than other flags, in my opinion *dishonor* Confederate soldiers. The same is true of the policies of other governments or private groups of banishing Confederate flags, removing Confederate monuments, renaming streets and schools named for Confederates and efforts to remove Confederate logos from state flags. I believe that to speak out against these policies and the assumptions that underlie them, especially at the gravesides of the Confederate soldiers I am defending, is to honor the Confederate dead.

17.   I also believe it honors Confederate soldiers to praise all persons and entities, whether private or governmental, federal, state, local or foreign, who show respect for Confederate soldiers, their flags and their cause. I believe it honors Confederate soldiers if a governmental body or private group who does not share my view of Confederate history shows tolerance for a viewpoint different

-11-

from theirs. My remarks concerning the treatment of Confederate history in contemporary society thus are not a digression from honoring the Confederate dead. They are my way of honoring Confederate soldiers, including my own ancestor and all others who were imprisoned at Point Lookout.

18. Although I submitted my remarks in advance prior to the 2002 ceremony to avoid potential arrest and prosecution, I do not wish again to submit any of my remarks for review by Mr. Rapp or any other VA official. I may, however, have no choice but to do so. In view of the VA's responses to my intended speech and the speech of Fr. Anderson, I am even more concerned about the VA's review of my speech. I believe such review constitutes censorship against particular viewpoints Mr. Rapp and/or other VA officials oppose, either because of their personal beliefs or for political reasons. Yet at the same time, I do not wish to jeopardize the ceremony or engage in speech that may expose others or myself to criminal prosecution.

19. The June 14, 2003 Confederate memorial ceremony, and other informal visits to the Cemetery at about the same time will also be occasions for a substantial amount of informal group discussion of the kind described earlier in this declaration. I expect that I will participate in informal discussions with small groups of attendees who gather spontaneously for discussion of a variety of topics, including the mistreatment of Confederate soldiers in Union prison camps; the valor and sacrifice of Confederates subjected to such treatment; and the VA's misguided policies of suppressing speech that honors these same Confederate soldiers, even in all-Confederate cemeteries. In addition, informal visits to the Cemetery occur during the PLPOW's pilgrimage, which spans the weekend of the Confederate memorial service. I sometimes participate in visits to the Cemetery with a small group of fellow SCV and/or PLPOW members. While there I engage in, and listen to, speech of the

types discussed earlier in this declaration.

20. The crowd at the June, 2002 ceremony numbered about two hundred (200) or more, most of whom are members of the SCV, PLPOW or both. I expect a crowd of similar size in 2003. My speeches are not inflicted on unwilling listeners. If I am prevented from speaking, at the June, 2003 ceremony, or if I am forced to alter or edit my remarks, two hundred (200) or more people who wish to hear my remarks will be unable to do so.

21. In addition to speaking at the ceremony, I also listen to formal speeches by others, including Fr. Anderson and Mrs. Patricia Buck. This commentary includes statements of opposition to VA restrictions on flag display and speech, as well as the Fourth Circuit's decision in my case. I also listen to other speakers in the course of informal group discussions at the Cemetery. I value highly my ability to hear these remarks by others. If they are unable to speak, or if they must alter their remarks, I will lose a substantial benefit of hearing and learning from their remarks.

22. At no time on any of my visits to VA (or other) cemeteries has any conduct destructive of property or injurious to persons occurred. The groups with which I conduct large- or small-group activities at VA cemeteries are composed of people who have expressed to me their reverence for the Confederate soldier and his final resting place, a reverence I share. In all my cemetery visits I have never incited any person to any kind of disruptive or destructive conduct. I have no intention of ever doing so. I deliver my remarks to small groups in a normal, conversational tone of voice and to large groups at a volume intended only to make my remarks clear and audible.

The same is true of the speech I wish to hear, such as Fr. Anderson's address. It is delivered in normal tones and incites no boisterous or disruptive behavior. I know this by having personally witnessed Fr. Anderson's 2000 and 2002 speeches at the Cemetery and his 1999 speech at Arlington Cemetery and having observed the crowd during my own speeches.

I declare that the foregoing is true and correct, under penalty of perjury under the laws of the United States of America.

Executed this 9th day of April, 2003, at Darnestown, Maryland.

*Patrick J. Griffin, III*
Patrick J. Griffin, III